SECURITY OPTIONS CORP., Plaintiff, *v.* RICHARD SHELTON, Defendant.

Supreme Court, Special and Trial Term, New York County, August 9, 1962.

*Alan C. Winick* (*Burton H. Zuckerman* of counsel), for plaintiff. *Cooper, Ostrin, De Varco & Ackerman* (*Martin S. Ackerman* and *Jerome B. Fleischman* of counsel), for defendant.

BERNARD NEWMAN, J. This is an action for money had and received. Plaintiff is a broker-dealer, specializing in the sale of over-the-counter securities. On April 3, 1961, defendant placed with plaintiff an order to sell 300 shares of Magna Bond stock at a specified price of $20.50 per share. The sale order was confirmed in writing, with the notice setting April 7, next ensuing, as the settlement date, and stating that the plaintiff was acting as defendant's agent in the transaction.

On the settlement date, plaintiff paid defendant the sum of $6,053, representing the prospective proceeds of the sale less brokerage commissions and taxes. This payment was made to defendant in spite of the fact that plaintiff had neither consummated the sale, received payment for the stock, nor effected delivery. Thus, plaintiff " advanced " the payment. However, it does not appear that defendant either requested the advance, or sought any unusual treatment.

On April 6, plaintiff mailed the securities to American Diversified Services, the prospective purchaser (herein called ADS), at Washington, D. C. The sale had been arranged over the telephone. On that same day, ADS was suspended and enjoined from trading by the Securities and Exchange Commission. Hence, delivery of the stock was rejected.

From this point on, the testimony of the principal witnesses differs sharply and is contradictory. Plaintiff asserts that it first became aware of the refusal and inability of ADS to accept and pay for the securities on the following Tuesday, April 11, when no payment was received through the mails; that the defendant was then advised of the situation for the first time; and that between April 3, the trading date, and April 11, the Magna stock had dropped some 10 points, or $3,000 in value. Plaintiff claimed that the defendant instructed it not to resell the Magna stock at the lowered price, but to hold it until it went up in value. However, plaintiff did not demand the return of the $6,053 payment until late in May of 1961, by which time the Magna stock had dropped to $9.50 per share, or 11 points under the original sale price.

The defendant unequivocally denied the statements attributed to him by plaintiff's president, and with equal vigor denied any conversation on April 11. Defendant testified that on April 6 (the day preceding payment), the plaintiff's president called him and stated: " * * * we run into a problem with collecting on the stock. * * * It has nothing to do with you.

It's one of the things that happens in the brokerage business, you've got to take the good with the bad, and we will send out a check on it." A check for the payment in litigation was sent to and received by the defendant, who testified that he had two or three subsequent stock dealings with the plaintiff, following the April 6 conversation; that he continued to keep stocks in a custody account with plaintiff; and that there was never any offset taken by plaintiff against these securities by reason of the payment in dispute. Defendant categorically denied any conversation with plaintiff on April 11, or subsequent to April 6, on the subject, until late in May, when repayment was requested.

Plaintiff's president, recalled on rebuttal, denied any conversation with defendant on April 6, but significantly did not deny that portion of defendant's testimony regarding subsequent trading transactions and the continued maintenance of a custody account, all without offset, after it became known that the sale to ADS had been rejected.

From the welter of the conflicting testimony, the court is satisfied that the payment sought to be recovered was a voluntary one; and that it was not made as a result of a mistake on plaintiff's part. The plaintiff knew that it had not completed the sale with ADS, and had not collected the sales price. Nevertheless, plaintiff chose to make the payment to the defendant; and after rejection of tender of the stock, it took no affirmative action for almost two months.

Money voluntarily paid, with full knowledge of the facts, may not be recovered in an action of this kind (see *Adrico Realty Corp.* v. *City of New York,* 250 N. Y. 29).

Even if it be assumed, *arguendo*, that the payment here was not a vountary one, and that it was made as a result of a genuine mistake on plaintiff's part, nevertheless, equitable considerations would compel a finding for defendant.

The plaintiff chose, as a prospective purchaser for the defendant's stock, a company with an open record of financial difficulty. It had been suspended from operations by the Securities and Exchange Commission as recently as January, 1961. A prompt execution of the " sale " order, to a reliable buyer, would have enabled the defendant to secure the bid price prevailing on April 3. By April 10, the price of the stock had dropped 10 points with a prospective loss to the defendant of $3,000. The defendant cannot be restored to *status quo.* It would seem unfair, under all of the circumstances attendant here, to require defendant to repay the plaintiff.

The law is well settled that a payment made under a mistake of fact may not be recovered where the payee has changed his

position. Thus, the sharp and almost immediate drop in the valuation of the Magna stock had put defendant in just such a position (*Ball* v. *Shepard*, 202 N. Y. 247, 256; *Hathaway* v. *County of Delaware*, 185 N. Y. 368; *National Bank of Commerce* v. *National Mechanics Banking Assn.*, 55 N. Y. 211; *Hibbs* v. *First Nat. Bank of Alexandria*, 133 Va. 94).

There was no requirement that plaintiff pay the proceeds of the sale until it had received payment from the purchaser. Hence, it may well be said that when plaintiff paid the money sought to be recovered herein, without waiting for the proceeds from ADS, it voluntarily changed the broker-customer relationship with defendant, and accepted the credit of ADS in exchange for the payment to defendant. That change became irreversible, particularly in view of the precipitate drop in the price of the stock after the sale had been made. Plaintiff may not be permitted to foist upon defendant the consequences of its unfounded confidence in the credit of ADS. As between the parties in the instant action, the equities are all in favor of defendant. The mistake here was not one of fact, but one of business judgment, and the burden of that error should not fall on the innocent party, when there was a change in position to the detriment of defendant. The *status quo* should be maintained, just as if the sale had been normally consummated.

Plaintiff, in its memorandum, argues that inasmuch as plaintiff acted as agent only, and the sale was never consummated, the principal must return to the agent the money paid by the agent in anticipation of the completed sale. In the court's opinion, the same rule of law must be applied whether the relation is that of principal and agent or debtor and creditor. The court finds that the transaction was concluded when the voluntary payment was made by the plaintiff with full knowledge of the factual situation extant; and that the principal-agent relationship terminated at that point.

Accordingly, judgment is directed in favor of the defendant, dismissing the complaint on the merits. No costs.

The above constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.